IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HORIZON/CMS HEALTHCARE CORPORATION,
a Delaware Corporation, and CONTINENTAL
MEDICAL SYSTEMS, INC., a Delaware
Corporation,

        Plaintiffs,

vs.                                          No.CIV 97-0979 MV/DJS

ROCCO ORTENZIO,

        Defendant;

ROCCO ORTENZIO,

        Plaintiff,

vs.                                          No. CIV 98-0776 BB/LS

HORIZON/CMS HEALTHCARE
CORPORATION,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

       THIS MATTER is before the Court on Defendant's Cross Motion to Preclude, filed October

13, 1998 **[Doc. No. 70]**, Defendant Rocco Ortenzio's Motion for Summary Judgment, filed

November 2, 1998 **[Doc. No. 90]**, Plaintiff Horizon/CMS's Motion for Summary Judgment on

Counts V and IX, Motion for Summary Judgment on Defendant Rocco Ortenzio's Counterclaims and

Memorandum in Support Thereof, filed December 8, 1998 **[Doc. No. 108]**, Plaintiff Horizon/CMS's

Motion for Summary Judgment on Count VIII and Memorandum in Support Thereof, filed December

8, 1998 **[Doc. No. 111]**.  After reviewing the pleadings, relevant law, and being otherwise fully

informed, the Court finds that Defendant's motions are not well taken and will be **denied**, and that

Plaintiffs' motions are well taken and will be **granted in part**.

## Background

This is a case involving two health care companies that merged in 1995, and one person's

association with both. Plaintiffs Horizon/CMS Healthcare ("Horizon") and Continental Medical

Systems ("Continental") have filed, pursuant to Court order, a first amended complaint in this

consolidated diversity action. In a lengthy factual recitation, Plaintiffs state that underlying this

litigation are contractual provisions arising from the merger of two companies, agreements not to

compete, promissory notes which Mr. Ortenzio executed in favor of one of the merged companies,

and the breach those contractual provisions. Mr. Ortenzio has brought several counterclaims, alleging

that Horizon itself has breached some of its contract obligations. It is undisputed that New Mexico

law controls.

I.      The claims

Prior to 1995 Mr. Ortenzio, a co-founder with his son of Continental Medical Systems

("CMS"), was its Chairman and Chief Executive Officer. As CEO, Mr. Ortenzio entered into an

employment agreement with CMS whereby he agreed not to compete with CMS facilities in providing

health care services. In 1995 Horizon Healthcare Corporation merged with CMS, with the surviving

company being Horizon/CMS.

As a result of the 1995 merger, Horizon and Mr. Ortenzio entered into termination and

consulting agreements.[1]  Because his employment with CMS terminated with the merger, Mr.

Ortenzio received a $5,100,000 bonus pursuant to the employment agreement and a payment

$3,700,000 pursuant to the termination agreement.  The termination agreement contained a release

of claims clause whereby both CMS and Mr. Ortenzio agreed that neither had claims against the other

and mutually released any potential claims.

Moreover, Mr. Ortenzio agreed to stay on with the merged company as a consultant, under

an automatically renewable integrated consulting agreement whereby he would receive an annual

retainer of $50,000, payable monthly and in advance.  The consulting agreement also provided that,

in return for Horizon's paying Mr. Ortenzio $6.5 million and funding a split-dollar insurance policy

("Split-Dollar I"), Mr. Ortenzio would neither compete with Horizon nor use or disclose any trade

secrets or proprietary information acquired as a result of his employment with CMS and his

consulting with Horizon.  The agreement particularly stated that Mr. Ortenzio could not,

> within twenty (20) miles of any health care facility which is controlled and majority-
> owned by [Horizon] or any of its consolidated subsidiaries, engage in any activities
> in competition with the Corporation if such activities are carried on in the same
> specific type of healthcare facility."[2]

First Amended Complaint at ¶ 43.

The consulting agreement contained a remedies clause outlining Horizon's rights in the event

of breach.  First, Horizon had access to any remedies available under applicable law.  Second,

---

[1]  Plaintiffs explain that there are three versions of each agreement.  The original consulting agreement, signed July 17, 1995, was amended on August 25 through an instrument dated July 10, 1995.  The final consulting agreement, dated July 17, 1995, was signed on or about March 26, 1996.  Likewise, the termination agreement, addressing the end of Mr. Ortenzio's employment with the pre-merger CMS, went through similar permutations on the same dates.  Plaintiffs note, however, that the final agreements superseded all others, and Plaintiffs generally refer to the versions of those agreements collectively.

[2] The Court sets out in more detail pertinent portions of the consulting agreement in Appendix A to this memorandum opinion.

Horizon could terminate all compensation and benefits it extended to Mr. Ortenzio. Finally, the remedies clause specified stepped repayments by Mr. Ortenzio of Horizon's consideration in the event of breach, dependent on the materiality and the time of the breach. Concurrent with his consulting position, Mr. Ortenzio became a member and vice chairman of the board of Horizon. He resigned those positions on November 8, 1995.

The termination of the automatically renewable consulting agreement could occur, after an initial two year period, upon notice of either party given at least three months prior to the end of a yearly term, with the terms beginning each July 17. Horizon alleges that Mr. Ortenzio gave notice on July 23, 1997. Thus, according to Horizon that notice was ineffective until July 17, 1998, and Mr. Ortenzio was bound by the terms of the consulting agreement until that date. Horizon claims having fully paid the agreement's annual retainers, tendering the $50,000 compensation to Mr. Ortenzio on January 25, 1996 for the 1995-96 term, on June 21, 1996 for the 1996-97 term, and on July 23, 1997 for the 1997-98 term. Horizon states that Mr. Ortenzio accepted the first two payments, but returned the third.

While at CMS and before the merger, Mr. Ortenzio executed several promissory notes. Two negotiable promissory notes were in the amounts of $2,362,500 and $2,185,787.50. The proceeds of the first note were used to purchase CMS stock options (the "Option Note"), while the proceeds of the second went to satisfying tax obligations arising from exercising those options (the "Tax Note"). Each of these notes is a demand note and requires the annual payment of interest. Horizon claims that Mr. Ortenzio has failed to tender this interest, beginning on December 31, 1996, and is in default under both notes. By letter dated July 8, 1997 which he sent to Horizon and its accounting firm, Mr. Ortenzio repudiated his obligations under the negotiable notes and the consulting

agreement.

Also before the merger, Mr. Ortenzio executed a $2,000,000 convertible debenture note in favor of CMS, the principal of which has since been reduced to $1,000,000. Horizon alleges, however, that as of November 1, 1996, Mr. Ortenzio has not paid any interest on the note's outstanding principal. Payment of this debenture note is secured by a subordinated note, due on May 1, 2012, with an interest rate of 7¾% and a principal amount of $2,000,000. Horizon alleges that because Mr. Ortenzio has attempted to exercise his option to convert this CMS 7¾% debenture, Horizon is entitled to a setoff of the unpaid $1,000,000, plus interest. Accordingly, Horizon states that both its obligations under the subordinated note and Mr. Ortenzio's obligations under the convertible note are discharged.

In addition to claiming that Mr. Ortenzio breached various promissory notes, Horizon alleges that he breached the covenant not to compete found in both the employment agreement and the consulting agreement. Horizon states that in the fall of 1996, Mr. Ortenzio founded another healthcare company, Select Medical Corporation ("Select"), which, under his direction and control, actively competed with Horizon in Horizon's markets. Horizon alleges that first, Select purchased Florida based Sports & Orthopedic Rehabilitation Services, Inc. ("SORS"), and proceeded to operate facilities that directly competed with Horizon facilities within a radius prohibited by the agreements. Horizon also charges that Mr. Ortenzio, acting through SMC and SORS, used confidential information to displace certain Horizon facilities from their locations and replace them with competitors. Third, Horizon has claimed in its amended complaint that Mr. Ortenzio recruited and hired some 47 employees away from their Horizon-owned facilities, and that Mr. Ortenzio has used confidential information in his training, marketing, and advertising materials. Finally, Horizon alleges

that Mr. Ortenzio, through his control of New York based Millennium Rehab Services ("Millennium"), has engaged in substantially the same activities ascribed to him in Florida.

In its amended complaint, Horizon has included three counts. The first requests declaratory relief. Count II addresses Mr. Ortenzio's alleged breach of the consulting and termination agreements. In Count III, Horizon seeks payment on the promissory notes.

The amended complaint significantly streamlines the claims in this action. In its original complaint Horizon had sought, in addition to the counts already described, a preliminary injunction, a permanent injunction, an accounting, and specific performance of the consulting agreement. Horizon had also brought claims under the original complaint of tortious interference with business relations and unfair trade practices.

II.      The Counterclaims

Mr. Ortenzio has brought counterclaims. Many allegations Mr. Ortenzio brings as part of these counterclaims mirror the factual version of events asserted by Horizon. For example, Mr. Ortenzio does not dispute that CMS employed him before, but not after the merger. He also confirms the existence of a consulting agreement, that Horizon thrice paid the annual retainer pursuant to the agreement, and that Mr. Ortenzio returned the third payment. Mr. Ortenzio verifies that he signed to promissory notes Horizon describes in its amended complaint. Where Horizon alleges Mr. Ortenzio failed to pay interest on the promissory notes beginning in 1996, Mr. Ortenzio states that he has paid this interest until December, 1995.

In one important respect, however, Mr. Ortenzio's allegations in his counterclaims differ significantly from the factual recitation Horizon and CMS have presented. Mr. Ortenzio asserts that

on January 22, 1996, he and the late Mr. Neal Elliott, then Horizon's chief executive officer, met in a hotel in New York and agreed on the terms of a contract which was to be separate from the consulting agreement already executed. Mr. Ortenzio claims that at that meeting, he and Mr. Elliott agreed that Horizon forgave any amounts Mr. Ortenzio owed on the promissory notes, that Horizon would fund an additional split-dollar insurance policy ("Split-Dollar II") through fifteen yearly $500,000 payments, and that the consulting agreement would be extended for an additional eight years, with annual premiums reduced to $20,000 from the original $50,000. Mr. Elliott and Mr. Ortenzio also allegedly agreed to include contract therapy as a prohibited activity under the consulting agreement's non-compete clause, and that the geographical radius of prohibited activity would increase from 20 to 30 miles. This alleged contract, however, was never reduced to writing and executed.

Mr. Ortenzio claims that Horizon has acted in accordance with this contract. Stating that he has, since its inception, adhered to all its terms and conditions, Mr. Ortenzio maintains that between January 22, 1996 and July 27, 1997, Horizon made the first annual payment on the second split-dollar policy discussed in the Elliott-Ortenzio contract, and repeatedly recognized the forgiveness of the promissory notes by failing to demand payments of any interest or principal. Mr. Ortenzio also alleges that when he complained to Mr. Elliott of a letter seeking confirmations of indebtedness, sent on July 3, 1996 by Horizon's comptroller, Mr. Elliott informed Mr. Ortenzio that the sending of this letter had been a mistake. Finally, Mr. Ortenzio states that when he informed Mr. Elliott of his founding Select Medical, Mr. Elliott made no objection.

In his counterclaims Mr. Ortenzio presents further factual averments. First, Mr. Ortenzio alleges that Horizon's actions amount to a bad faith breach of contract that warrants both

compensatory and punitive damages. Next, Mr. Ortenzio claims that the consulting agreement with Horizon contained a hold harmless clause, under the terms of which he is entitled to indemnification for defending in this action. Third, Mr. Ortenzio avers that Horizon has failed to make the interest payments that the CMS 7¾% subordinated debenture requires, and has therefore breached the terms of that debenture. Fourth, Mr. Ortenzio states that Horizon has failed to perform the conversion specified in the debenture, which he requested. Finally, Mr. Ortenzio has brought what the Court construes as a fraud or misrepresentation claim. Without specifically using those terms, Mr. Ortenzio alleges that, had he known that Horizon would repudiate the January 22, 1996 representations Mr. Elliott allegedly made in New York, he would not have signed the final consultation and termination agreements on March 26, 1996. In this last counterclaim, Mr. Ortenzio seeks avoidance or rescission, because of that alleged misrepresentation, of the consultation and termination agreements.

III.    The motions

Horizon has filed two summary judgment motions which, taken together, address all counts in the first amended complaint. In Horizon's first motion [Doc. 108], Plaintiffs seek summary judgment on the declaratory judgment and breach of consulting agreement counts, now Counts I and II of the amended complaint. In Horizon's second motion [Doc. 111], Plaintiffs seek summary judgment on the payment of the promissory notes, now Count III of the three count amended complaint.

Mr. Ortenzio also has filed a motion for summary judgment. In that motion [Doc. No. 90], Mr. Ortenzio seeks summary judgment as to Counts I-VII and IX of the original complaint. Because only the original counts V (breach of consulting agreement), VIII (payment of promissory notes), and

IX (declaratory judgment), albeit renumbered, remain in this action Mr. Ortenzio's motion with respect to all other original counts is now moot, a fact which Mr. Ortenzio has implicitly recognized. *See* Defendant Rocco Ortenzio's Response in Partial Opposition to Plaintiffs' October 21, 1998 Motion to Amend Complaint at 1. The present procedural posture of this case, then, is that the Court must address cross motions for summary judgment on the declaratory judgment and breach of consulting agreement claims, and Plaintiffs' motion for summary judgment on its claim of nonpayment on the promissory notes.

### Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, the moving party initially carries the burden of pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, although the moving party "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment." *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 1165 (1998), *citing Celotex v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). The Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party, *Allen*, 119 F.3d at 839-40, and materiality of facts in dispute, if any, is dependent upon the substantive law, *id.* at 839, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has met this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show, through affidavits, depositions, answers to interrogatories, and the

like that there is a genuine issue for trial. *Allen*, 119 F.3d at 841, *citing Celotex*, 477 U.S. at 324; *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1988). Conclusory allegations are not enough, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-72 (10th Cir. 1998), but summary judgment "is warranted only if the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

I.      The Cross Motions for Summary Judgment on the Consulting Agreement and Declaratory Judgment Counts

        A.  The Breach of the Consulting Agreement

The Court first turns to whether Mr. Ortenzio has breached the covenant not to compete found in the consulting agreement. Not denying that some of Select's subsidiaries have engaged in competitive acts that would otherwise be in breach of the agreement, Mr. Ortenzio argues that he has not personally competed with Horizon, and therefore is not in breach of his obligations. In support of this argument, Mr. Ortenzio points out that he was merely an employee and minority stockholder of Select, and therefore had no direct involvement with Select's acquisition of Florida-based SORS. In his reply brief, Mr. Ortenzio also argues that he has had no direct involvement with Select's New York subsidiary Millennium. The Court disagrees with Mr. Ortenzio's argument, and concludes that by starting and managing a health care company which immediately began acquiring Horizon competitors, Mr. Ortenzio breached the covenant not to compete.

        The covenant not to compete contains broad language through which, in return for substantial payments, Mr. Ortenzio agrees not to engage in any activities in competition with Horizon. While

Mr. Ortenzio claims that the absence of the qualifier "indirect" in this agreement leaves him free to be merely an employee of a corporation that competes with Horizon, the Court finds that Mr. Ortenzio's arguments unpersuasive in light of the undisputed facts in this case.

Mr. Ortenzio has shown that he started Select in 1996 for the express purpose of reentering the health care field. By letter of November 4, 1996, Mr. Ortenzio personally communicated to Mr. Elliott that, because he was bored, he decided to re-enter the business, focusing on both the outpatient and inpatient sector. Reassuring Mr. Elliott that he was mindful of his obligations regarding the non-compete agreement, Mr. Ortenzio also explained that the same backers who had helped him start two prior companies would be involved in financing Select. Finally, Mr. Ortenzio invited Horizon, through Mr. Elliott, to invest in his new venture. Exhibit B to Memorandum of Law of Defendant Rocco Ortenzio in Support of Motion for Summary Judgment as to Horizon/CMS Healthcare's Complaint. Clearly, then, Mr. Ortenzio did not merely become an employee of a Horizon competitor. He created that competition from the ground up, and in February, 1997 directed Select to purchase competitor SORS.

Mr. Ortenzio cites *Cenco Instruments Corp. v. Thomas*, 225 N.E.2d 482 (Ill. App. Ct. 1967) for the proposition that where a covenant not to compete does not expressly prohibit employment with a competitor, a signatory to that covenant is free to accept such employment. While not disagreeing with the reasoning of *Cenco*, the Court finds the present facts markedly different than in that case. The defendant in *Cenco* had been employed by two competitors as a "mere employee at a modest salary with no interest in the [competitor's] business." *Id.* at 484. Unlike this mere employee, Mr. Ortenzio actively pursued the same stream of funding that had worked for him in establishing two prior corporations, started a corporation, became its chief executive officer, and

within a very short span of time began acquiring direct competitors to Horizon. Mr. Ortenzio, according to his deposition testimony, is chairman and chief executive officer of Select and a member of its board of directors. Moreover, Mr. Ortenzio has admitted in a newspaper interview that he and his son formed Select once they could "determine [that they were] very confident and comfortable that [they] could attract the very good experiences of people who worked for [them] in the past." Exhibit 3 to Plaintiffs Horizon/CMS' Motion for Summary Judgment on Counts V and IX, Motion for Summary Judgment on Defendant Rocco Ortenzio's Counterclaims and Memorandum in Support Thereof. Nor has Mr. Ortenzio disputed the allegations, supported by deposition testimony and affidavits, that Select hired Horizon employees and obtained confidential materials from Horizon subsidiary Rehab Works. In short, Mr. Ortenzio has based almost his entire argument not on the underlying facts, but on his construction of the consulting agreement. The language of this agreement, because it prohibited Mr. Ortenzio from engaging in any competitive activities, prohibited his competing with any health care facility of Horizon or its consolidated subsidiaries through a corporation which he created and directed.

Mr. Ortenzio next argues that at a minimum the term "facility" is ambiguous, necessitating its precise definition by a fact finder. The Court finds no such ambiguity. As Horizon points out, the term facility from its plain meaning is "a widely inclusive term, embracing everything which aids or makes easier the performance of the activities involved in the business or a person or corporation." *Boswell Grain and Elevator, Inc. v. Kentland Elevator and Supply, Inc.*, 593 N.E.2d 1224, 1227 (Ind. Ct. App. 1992), *citing* 35 C.J.S. Facility (1960); *see also* Webster's Third New International Dictionary 812-13 (1971). The term "health care facility," then, is broad enough to include the outpatient rehabilitation clinics which are in part the subject of this litigation.

Mr. Ortenzio also argues that the consulting agreement only ran for two years, from July 1995 to July 1997, because he properly gave notice of its termination. Mr. Ortenzio states that his giving notice on July 23, 1997 terminated the consulting agreement on July 10 of that year.[3] Consequently, according to Mr. Ortenzio the consulting agreement only lasted for two years. The plain language of the agreement, however, is contrary to this interpretation of the effect of his July notice to Horizon.

The agreement itself clearly shows that it remained in effect until July, 1998. The agreement was to be automatically extended unless one of the parties gave written notice at least three months prior to the end of the current term. The annual terms ran from each July 10. Thus, in order to be effective at the agreement's anniversary notice had to be given on or before April 10 of each year. Mr. Ortenzio notified Horizon that he was opting out of the agreement on July 23, 1997, well outside the three month limit for notice to which he agreed. Exhibit M to Memorandum of Law of Defendant Rocco Ortenzio in Support of Motion for Summary Judgment as to Horizon/CMS Healthcare's Complaint. By operation of the term of agreement clause in the consulting agreement, the notice could only take effect with the term beginning in July, 1998. Thus, the consulting agreement ran into a third year and Mr. Ortenzio was bound to comply with the agreement until that date.

Notwithstanding this obligation, however, Mr. Ortenzio argues that under § 7(c) of the agreement, he was entitled to receive notice of his breach and to be given an opportunity to cure. It is clear that § 7(c) sets out the availability of notice and cure mechanisms. Horizon gave Mr. Ortenzio notice of breach on July 22, 1997. *Id.*, Exhibit L. Mr. Ortenzio claims that, through

---

[3] There is a discrepancy in the pleadings with respect to the anniversary date of the consulting agreement. Mr. Ortenzio places it at July 10, with Horizon citing July 17. This discrepancy is immaterial in light of the time Mr. Ortenzio gave his notice of non-renewal pursuant to the agreement.

divesting himself of his ownership interests in various corporations, he has complied with the stock ownership restrictions of § 7(b), and therefore cured any breach of the noncompete clause. For the reasons set out above, the Court disagrees. Mr. Ortenzio's competitive activities revolved not around stock ownership, but around his founding and managing a company that directly competed with a Horizon subsidiary. Thus, that Mr. Ortenzio after receiving notice divested himself of certain stocks in order to comply with the ownership limitations of § 7(a) does not diminish his engaging in activities in activities that competed with Horizon. Mr. Ortenzio's attempt at curing his breach, therefore was ineffective.

As a result of this uncured breach, Mr. Ortenzio is liable for damages. Section 7(c) plainly states that Horizon is entitled to terminate all compensation and benefits to Mr. Ortenzio which it provided under the agreement. Thus, Horizon may, as a consequence of the breach, discontinue any insurance premiums it might still be paying under the Split-Dollar I policy. Horizon has sought other damages, including the repayment of 50% of its cash payment and the restitution of all sums it has paid to Mr. Ortenzio pursuant to the consulting agreement. Under either the contractual or restitution theories of recovery, however, genuine issues of material fact preclude summary judgment.

B. The Restitution Remedy

Horizon is not limited in the damages it may seek by the language of § 7. Although this section contemplates a precise remedy mechanism that Horizon may utilize in the event of breach, § 7 also clearly states that Horizon has access to "any remedies provided under applicable law." It is under this last provision that Horizon is seeking restitution in this case.

Horizon requests the full restitution of its cash payments and Split-Dollar I insurance

premiums. Arguing that restitution is available under the facts of this case, Horizon implicitly asks the Court to allow rescission of the contract between it and Mr. Ortenzio. Because there are genuine issues of material fact as to the scope of Mr. Ortenzio's breach, the Court will deny summary judgment on this claim.

Generally, "[t]here must be a substantial failure of consideration to warrant rescission." *Samples v. Robinson*, 275 P.2d 185, 187 (N.M. 1954); *see also* Restatement (Second) of Contracts § 373 cmt. a (1979) (noting that where "the breach is by non-performance, restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach"). Rescission, and restitution,

> is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for.

*Samples*, 275 P.2d at 187-88.

That the New Mexico Supreme Court, addressing illegal contract zoning, noted that "in the context of contract law, restitution is a remedy that restores to a contracting party any benefit he or she has conferred on the other party through part performance or reliance," *Dacy v. Village of Ruidoso*, 845 P.2d 793, 798 (N.M. 1992), does not change this principle. For the language of *Dacy* does not address the facts facing the Court here: an instance where a breaching party has partly performed on a legal contract.

From Horizon's allegations themselves, it is clear that Mr. Ortenzio has in part complied with his promise not to compete. The covenant became effective in 1995, yet it was not until late 1996

that Mr. Ortenzio, bored with retirement, launched himself back into the healthcare business. Moreover, Select did not acquire SORS until February 1997. Lastly, Horizon does not dispute that it divested itself of Rehab Works, its Florida subsidiary with which SORS competed, on December 31, 1997. For a not insignificant length of time, at least with respect to SORS, Mr. Ortenzio complied with the covenant not to compete. Thus, one factual issue precluding summary judgment in favor of Horizon for its restitution claim is whether Mr. Ortenzio's breach constituted such a substantial failure of consideration as to warrant rescission.

*Ennis v. Interstate Distributors, Inc.*, 598 S.W.2d 903 (Tex. Civ. App.– Dallas 1980, no writ), which Horizon cites as on point persuasive authority, does not counsel a different result. In *Ennis*, the former employee began competing with Interstate before his termination but after the signing of the purchase contract for his outstanding shares which included a restrictive covenant. *Id.* at 905. After reviewing the record, the appellate court concluded that for substantially all his time during the three year period, Ennis engaged in prohibited competitive activity. *Id.* at 905-06. In the present case Mr. Ortenzio competed with Horizon from February, 1996 to July, 1998, a little over two-thirds of the time the noncompete clause in the consulting agreement was in effect. Moreover, *Ennis* did not involve the same procedural posture as the motions now before this Court. The *Ennis* appellate panel had the benefit of a jury finding of a failure to perform the obligations of the covenant, whereas this Court is charged, for the moment, with deciding whether genuine issues of material fact preclude summary judgment on the rescission issue. A trial may show that Mr. Ortenzio has acted as Horizon alleges, thus warranting recession. For the present, however, it is sufficient that this issue is one the Court must reserve for a fact finding.

C.  The Contractual Remedy

If a breach is material and has resulted in material damages to Horizon, Mr. Ortenzio must return 50% of the cash payment as per the terms of § 7(c) since he has not cured his breach after receiving notice and that breach occurred on or after July 10, 1996 but before July 10, 1997. That Mr. Ortenzio did not breach until the second year of the agreement is irrelevant to the contractual remedy analysis, for § 7(c) expressly incorporates stepped repayment of the contract price in its provisions:  were Mr. Ortenzio to breach in the first year, he would be liable to repay the full 100% of Horizon's consideration. Rather, the focus of the inquiry here is whether, in all other respects, Mr. Ortenzio's breach was material and resulted in material damage to Horizon.

The parties forcefully disagree on the financial impact on Horizon of Mr. Ortenzio's activities through Select. Horizon argues that Mr. Ortenzio's activities clearly impacted its subsidiaries, which are protected by the noncompete agreement. Mr. Ortenzio, on the other hand, argues that any financial impact on Horizon as a whole is minuscule, given the sales and financial assets of this large corporation. However, the extent of financial harm flowing from "a breach is not necessarily dispositive on the question of materiality." *Famiglietta v. Ivie-Miller Enterprises, Inc.,* 966 P.2d 777, 782 (N.M. Ct. App. 1998), *cert. denied*, 972 P.2d 351 (N.M. 1998). Rather, the Court must look to the factors gleaned for the Restatement (Second) of Contracts as set out in *Famiglietta*.

Considering these factors, the Court finds that they present genuine issues of material fact which require a determination of materiality of the breach and its consequences by the fact finder in this case. Under the Restatement approach implicitly adopted by *Famiglietta*, courts should examine 1) the extent to which the injured party was deprived of the benefit it reasonably expected to receive from the contract, 2) the extent to which the breaching party will suffer forfeiture if the breach is

17

deemed material, 3) the extent to which the injured party can be adequately compensated in damages, 4) the extent to which, if any, the breaching party has cured his or her failure to perform, and 5) the extent to which, if any, the breaching party's conduct comported with the standards of good faith and fair dealing. *Famiglietta*, 966 P.2d at 782. Although it is clear by this point that Mr. Ortenzio has breached his duty not to compete and has failed to cure that breach, other factors are yet undetermined. Mindful that the materiality of a breach is a specific question of fact, *id., see also Lukoski v. Sandia Indian Management Co.*, 748 P.2d 507, 508 (N.M. 1988), the Court is bound to leave the materiality decision to the fact finder.

### D. The Awarding of Legal Fees

Horizon maintains that the Court should award it attorneys' fees under the agreement. Section 8 (h) of the agreement controls this issue, and states in part that

> [t]he Corporation [Horizon] hereby agrees to indemnify and hold harmless Consultant [Ortenzio] against any and all losses, claims, damages, liabilities and expenses (including attorney fees and expenses reasonably incurred in connection therewith and amounts paid in settlement of any claim), which Consultant may incur or become subject to arising out of, or based upon services rendered pursuant to this Agreement, other than any such arising out of his willful misconduct or gross negligence. Consultant hereby agrees to indemnify and hold harmless the Corporation against any and all losses, claims, damages, liabilities and expenses (including attorneys fees and expenses reasonably incurred in connection therewith and amounts paid in settlement of any claim), which the Corporation may incur or become subject to arising out of or based upon, Consultant's willful misconduct or gross negligence in providing services pursuant to this agreement.

Consulting Agreement, Appendix A to Memorandum of Law of Defendant Rocco Ortenzio in Support of Motion for Summary Judgment as to Horizon/CMS Healthcare's Complaint.

Read as a whole, this section allows the parties to recover attorneys' fees only upon willful

misconduct or gross negligence in providing consulting services under the agreement. The claims here do not relate to those services, but rather expressly address a breach of the agreement. There is no basis, therefore, for the award of attorneys' fees to either party under § 8(h).

E.  Mr. Ortenzio's First Two Counterclaims

Horizon also asks the Court to grant it summary judgment on Mr. Ortenzio's first two counterclaims. In his first counterclaim, Mr. Ortenzio alleges that Horizon has breached the Elliott-Ortenzio contract arrived at in the New York hotel on January 22, 1996. In his second counterclaim, Mr. Ortenzio maintains that under § 8(h) of the consulting agreement, he is entitled to indemnification of his costs.

As the Court has already indicated, under § 8(h) neither party is entitled to attorneys' fees or indemnification under the present facts. Thus, summary judgment in favor of Horizon on the second counterclaim lies.

The parties have not properly addressed the first counterclaim. Horizon has argued that it has not breached the consulting agreement, but that is not the subject of the counterclaim. Rather, that claim alleges breach of what Mr. Ortenzio has called the Contract, or the alleged oral agreement between him and Mr. Elliott. For his part, in his responsive pleading Mr. Ortenzio has not noticed the discrepancy. The Court, therefore, is left without the proper arguments that would illuminate this counterclaim and could lead to a ruling on that portion of Plaintiffs' summary judgment. Notwithstanding this lack of pleading, however, because the Court concludes, as set out below, that the January 22, 1996 Elliott-Ortenzio contract, if it ever existed, is unenforceable as a matter of law, the Court will grant summary judgment in favor of Horizon on this counterclaim.

II.	Plaintiffs' Motion for Summary Judgment on the Payment of the Promissory Notes

A.	Facts

This motion centers on two of the promissory notes that Mr. Ortenzio executed in favor of CMS, the proceeds of which went to the exercise of stock options and the fulfillment of tax obligations arising from those options. The issue here is whether discussions which Mr. Ortenzio had with Mr. Elliott in January 22, 1996 constituted a contract sufficient to relieve Mr. Ortenzio from any liability to repay the notes' principal or interest.

Each side has presented more factual detail than in the complaint or answer. Claiming that the notes are binding on Mr. Ortenzio and that he has not paid interest after December 31, 1995, Horizon alleges that it wrote a demand letter to Mr. Ortenzio on July 22, 1997, following the latter's repudiation of those notes on July 10, 1997. Horizon also states that, in addition to their demand provisions, the notes contained a clause compelling Mr. Ortenzio, if he sold shares acquired pursuant to the options, to pay all the net proceeds from such sale to satisfy CMS in payment of the notes, up to the amount then due.

Horizon acknowledges that Mr. Ortenzio entered into extensive discussions with it regarding a modification of the July, 1995, consulting agreement. There, one of the benefits Mr. Ortenzio sought was the forgiveness of all debt due under both promissory notes. Indeed, Horizon present substantial supporting testimony to show that the parties in 1996 actively considered modifying the consulting agreement, including a letter sent by the accounting firm Arthur Andersen and minutes of Horizon board meetings. However, Horizon claims that no modification to the consulting agreement or new contract was ever finalized, much less reduced to writing. Therefore, Horizon asserts that Mr. Ortenzio is bound by the terms of the promissory notes, and must pay all principal and interest

due as a result of his sale of stock and Horizon's demand letter.

For his part, Mr. Ortenzio agrees that he executed the promissory notes. He contends, however, that tax considerations prevented their forgiveness from being included in the 1995 consulting agreement. Mr. Ortenzio further contends that discussions with respect to an expanded consulting agreement began almost immediately after the 1995 merger. Mr. Ortenzio has also presented evidence, through deposition testimony and affidavits of his former associates at the pre-merger CMS who, like him, had become directors of Horizon after the merger, alleging that the Horizon board approved the expanded consulting agreement in 1995. According to Mr. Ortenzio, discussions on the expanded agreement culminated in a January 22, 1996 meeting in New York where he and Mr. Elliott, then CEO of Horizon, finally agreed to the forgiveness of the promissory notes, the funding of an additional split-dollar life insurance policy through fifteen annual $500,000 premium payments ("Split-Dollar II"), and the expansion of the consulting agreement. Mr. Ortenzio does not dispute, however, that the expanded agreement was never reduced to writing. Indeed his own witness Mr. Leroy Zimmerman, then a board member of Horizon and a former board member of the pre-merger CMS, alleges in a sworn declaration that in a tense March 18, 1996 Horizon board meeting, despite each board member's individually assenting to the expanded agreement the board determined that execution of the written agreement should be deferred.[4]

Mr. Ortenzio also avers that in recognition of the expanded consulting agreement Horizon took several actions that serve to confirm the agreement's existence. First, Mr. Elliott allegedly did

---

[4] According the Mr. Zimmerman, there was by March, 1996 intense scrutiny of Horizon. As a result of disappointing earnings projections there had been a significant decline in the trading price of Horizon common stock. In addition, the United States Department of Justice and Office of the Inspector General of the Department of Health and Human Services were investigating Horizon's billing practices.

not protest when on January 29, 1996 Mr. Ortenzio sent him a written summary of the agreement. Second, and significantly, Horizon made an initial $500,000 premium payment on March 1, 1996. Third, although Mr. Ortenzio's sale of Horizon shares in January and February, 1996, reported in public filings with the Securities and Exchange Commission, should have triggered a demand for payment from Horizon, Horizon made no such demand. Fourth, Mr. Ortenzio refers to the March 18, 1996 meeting where Horizon's board allegedly approved the expanded agreement. Fifth, Mr. Horizon states that after that meeting, Mr. Elliott called him to confirm the board's approval of the agreement. Sixth, Mr. Ortenzio states that Mr. Elliott acknowledged in July, 1996 that a letter Horizon had sent seeking confirmation of the amounts due under the notes was in error. Seventh, Mr. Ortenzio states that although Horizon maintained the validity of the notes, it failed to demand interest payments on the notes in December, 1996. Lastly, Mr. Ortenzio states that a written demand on the notes did not come until July 22, 1997, several months after Horizon itself had merged with another corporation.

B. Discussion

Horizon argues that Mr. Ortenzio has not shown through admissible evidence that the Court should deny Horizon summary judgment, because he has not presented sufficient admissible evidence of the modification of the 1995 consulting agreement. Specifically, Horizon argues, citing *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238 (N.M. 1991), that parol evidence of a contractual modification is not admissible to alter the terms of the contract. "The parole evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing." *Id.*, 817 P.2d at 243. Generally, where a contract is

unambiguous, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms. *Id.*, 817 P.2d at 242.

Mr. Ortenzio counters by stating that the parol evidence rule does not apply where a party is seeking to introduce a subsequent agreement to modify a contract. The Court notes that Mr. Ortenzio is here taking the opposite position that he took in his answer to the amended complaint, where he asserted that with respect to the January 22, 1996 meeting with Neal Elliott, "Mr. Ortenzio and Mr. Elliott intended the Contract to be a separate agreement and not a modification of the Consulting Agreement." Answer to First Amended Complaint and Counterclaims at 12. Mr. Ortenzio's inconsistent position with respect to the Elliott-Ortenzio alleged contract is once again highlighted in his Reply Memorandum in Support of his Motion to File Surreply of Rocco Ortenzio's in Opposition to Plaintiff's Motion for Summary Judgment on Count VIII at 4, where he returns to the position that the January, 1996 agreement is a new contract. Finally, Mr. Ortenzio hedges his bets in his surreply to the current motion, where he moves from factual assertion to argument, inviting the Court to rule on whether the 1996 agreement is a new contract or a modification. It is readily apparent, then, that Mr. Ortenzio does not hesitate to present inconsistent factual assertions when the perceived need arises.

The Court need not decide on the parol evidence issue, for the statute of frauds stands in Mr. Ortenzio's way in his assertion that a new contract forgave the promissory notes. The statute of frauds is part of the common law of New Mexico. *See* N.M. Stat. Ann. § 38-1-3 (Michie 1998); *Maljamar Oil & Gas Corp. v. Malco Refineries, Inc.*, 155 F.2d 673 (10th Cir. 1946).[5] As a general

---

[5] Mr. Ortenzio has argued that New York law applies to this agreement, allegedly finalized in a New York City hotel. Chief Judge Sylvia Rambo of the Middle District of Pennsylvania, however, has already ruled concluded that New Mexico law applies. *Ortenzio v. Horizon/CMS Healthcare Corp.*, No. CV-97-1126, slip. op.

rule, a determination of the applicability of the statute of frauds is a question for the court, not the jury. *Kestenbaum v. Pennzoil*, 766 P.2d 280, 284 (N.M. 1988). In the alleged the Elliott-Ortenzio agreement, Mr. Ortenzio claims that he was to provide consulting services for an additional eight years. An agreement contemplating action that is not to be performed within the space of one year must be reduced to writing and signed by the party to be charged therewith. *Westerman v. City of Carlsbad*, 237 P.2d 356, 357-58 (N.M. 1951). The writing need not be the contract itself and can be merely written evidence of a contract; it must, however, be signed by the party to be charged, in this case Horizon or Mr. Elliott as Horizon's CEO. *See Aragon v. Boyd*, 450 P.2d 614, 617 (N.M. 1969).[6] Mr. Ortenzio has presented no such signed writing, whether contract, memorandum, note, letter, or minutes of Horizon's board of directors which would support his contract claim in light of the statute of frauds.

Mr. Ortenzio nevertheless argues that the Court should not enforce the statute of frauds in this case because the parties have sufficiently performed on the contract to show its existence. "It is not a light matter to refuse to apply the clear rule of the statute of frauds." *Nashan v. Nashan*, 894 P.2d 402, 406 (N.M. Ct. App. 1995). In considering the statute as a bar to the transfer of property based on an oral contract, New Mexico courts insist that "the performance be evidential of the existence of a contract and not readily explainable on some other ground." *Id.*, 894 P.2d at 407. As the New Mexico Supreme Court stated in a different case,

> [r]emoval of an oral contract from the operation of the statute of frauds is a

---

at 6 (M. D. Pa. June 15, 1998). This Court will not revisit the issue, and notes in passing that in Pennsylvania Mr. Ortenzio took the position that the Elliott-Ortenzio agreement was a modification of the consulting agreement, not a new contract.

[6] Due to the lack of any signature, the parties' dispute regarding Mr. Elliott's real or apparent authority is irrelevant.

serious matter and evidence of part performance is designed to show, among
other things, that there must have been an oral contract or [the party against
whom the contract is to be enforced] would have never performed the acts he
did. If the acts could have been performed for another reason, then the
existence of the oral contract is left in doubt.

*Candelaria v. Sandoval*, 503 P.2d 1165, 1167 (N.M. 1972).

The critical inquiry in this case, then, is whether Horizon has performed to such an extent that its

performance on the alleged Elliott-Ortenzio contract is not explainable for another reason.

Here the only clear evidence that Horizon acted as if the agreement existed, other than the

claims of Mr. Ortenzio, is the $500,000 premium payment Horizon made on March 1, 1996, the first

of fifteen yearly payments on the Split-Dollar II insurance policy.[7]  Horizon Chief Financial Officer

Mr. Ernest Schofield testified in his deposition that he did not consult with Mr. Elliott regarding this

payment his decision to sent the March 1 payment.  As Mr. Schofield explained:

I was under the impression that there was a certain time urgency with respect
to the cost of the policy and perhaps even to the placement of the policy, and
so I basically just went out on a limb.  My expectation was, if Split Dollar II
was ultimately approved, in the long run, it would end up costing Rocky
[Ortenzio] and the company less money to bind it with that initial premium
than if we waited and the premium went up, or he became much more costly
to insure.  And I certainly felt that if it came about that Split Dollar II was
never put into place, I felt reasonably comfortable that Rocky had the
wherewithal to unwind the transaction.

Deposition of Ernest Allen Schofield, Vol.1, Nov. 20, 1998 at 110, Exhibit A to Plaintiff

Horizon/CMS' Reply in Support of Motion for Summary Judgment on Count VIII.

Mr. Schofield denied that Mr. Elliott and Mr. Ortenzio, to his knowledge, had finalized an expanded

---

[7] The Court agrees that Mr. Zimmerman's declaration, to the extent it speaks to issues of contract
formation, is not competent evidence by reason of its hearsay nature or lack of foundation.  *See Thomas v.
International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995).  For example, Mr. Zimmerman repeatedly
refers to his understanding of the Elliott-Ortenzio agreement as derived from conversations with Mr. Ortenzio.
Mr. Zimmerman's assertion that board members individually asserted their approval of the alleged agreement is, of
course, offered to prove the truth of the matter asserted.

consulting agreement. Mr. Ortenzio's witness, insurance agent Joshua Gottlieb, confirmed in his deposition that the insurance carrier on the policy was pressuring a transaction. Mr. Gottlieb also confirmed that Mr. Ortenzio was required at the time to submit new medical information. Finally, Mr. Gottlieb stated that Mr. Schofield, before sending a premium, told him Horizon was going ahead with Split-Dollar II. *See generally* Deposition of Joshua Gottlieb, Sept. 17, 1998 at 95, 100. Mr. Gottlieb did not testify that an agreement had been reached. At best, then, the deposition evidence surrounding Horizon's payment of the first Split-Dollar II premium shows concern over preserving an economic advantage should the expanded agreement be finalized, but is equivocal regarding an oral understanding allegedly reached by Mr. Elliott and Mr. Ortenzio.

Further evidence indicates that the payment of the Split-Dollar II premium may have stemmed in part from other considerations. The minutes of the March 18, 1996 Horizon board meeting show that a majority of the board came to consensus to take action, with respect to Mr. Ortenzio's life insurance policies, that would preserve certain tax advantages. Aside from this concern however, the minutes clearly reflect a desire to place any other matters with respect to an expanded consulting agreement in abeyance.

Under these facts, the Court concludes that the payment of the first Split-Dollar II premium, while perhaps indicative of a finalized agreement, is not sufficiently so to justify setting aside the statute of frauds in this case. Horizon has shown that it reasonably could have made the premium payment for reasons other than performance on the alleged finalized contract. Certainly there is credible and reliable evidence before the Court that the parties contemplated an agreement that would confer significant benefit upon Mr. Ortenzio, and that Mr. Ortenzio pushed hard for acceptance of this agreement. There is no evidence, however, that would allow this Court, pursuant to New

Mexico law, to decline to apply the statute here.

III.     Defendant's Cross Motion to Preclude

In this motion Mr. Ortenzio seeks to preclude the testimony of Horizon representative Mr. Sean Dailey, on the grounds that Horizon unnecessarily resisted the deposition of Mr. Dailey and because he would testify to matters of which he has no personal knowledge. Horizon initially resisted the deposition Mr. Dailey because it contended that Mr. Ortenzio and SORS had impermissibly delayed producing necessary SORS financial information. Mr. Ortenzio argues that Mr. Dailey, as a fact witness who was not employed by SORS, has no personal knowledge of SORS' financial activities. Mr. Ortenzio also argues that even considering Mr. Dailey a corporate representative, he may testify under Fed. R. Evid. 30(b)(6) only to matters known or reasonably available to the organization, in this case Horizon. The parties imply that because discovery has closed in this case, Mr. Ortenzio has not been able to fully depose Mr. Dailey.

The Court will allow the conclusion of Mr. Dailey's deposition and deny the motion to preclude. Both parties have presented meritorious arguments to the Court. Because Mr. Dailey as a corporate representative need not testify to matters personally known to him or in which he was personally involved, he must be able to educate himself in order to speak for the corporation. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D. N.C. 1996). However, at the conclusion of the deposition Mr. Ortenzio must be free to present foundational arguments either in a motion in limine or at trial. Accordingly, the parties will expedite the deposition of Mr. Dailey.

THEREFORE,

IT IS HEREBY ORDERED that Defendant's Cross Motion to Preclude, filed October 13,

1998 **[Doc. No. 70]**, and Defendant Rocco Ortenzio's Motion for Summary Judgment, filed November 2, 1998 **[Doc. No. 90]** be, and hereby are, **denied**.

IT IS FURTHER ORDERED that Plaintiff Horizon/CMS's Motion for Summary Judgment on Counts V and IX, Motion for Summary Judgment on Defendant Rocco Ortenzio's Counterclaims and Memorandum in Support Thereof, filed December 8, 1998 **[Doc. No. 108]** be, and hereby is, **granted in part**.

IT IS FURTHER ORDERED that Plaintiff Horizon/CMS's Motion for Summary Judgment on Count VIII and Memorandum in Support Thereof, filed December 8, 1998 **[Doc. No. 111]** be, and hereby is, **granted**.

IT IS FURTHER ORDERED that Mr. Ortenzio may conclude his deposition of Mr. Sean Dailey.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

April 23, 1999

Counsel for Horizon/CMS

John M. Eaves
Derek Larson
Peter Kierst
Paul Bardacke

Counsel for Mr. Ortenzio

Victor Ortega
Andrew Montgomery
John Sullivan

## CONSULTING AGREEMENT

2.      Term of Agreement.  The term of Consultant's [Mr. Ortenzio] services under this agreement shall be for two years commencing on the date hereof; provided, however, that this Agreement shall be automatically extended for additional one-year periods unless, at least three months prior to the end of the then current term, either party hereto shall give the other party notice that it does not wish to extend the agreement.

7.      Noncompetition: Confidential Information.   As consideration for payment of $6.5 million (the "Cash Payment") to the Consultant and the payments to be paid to and other benefits to be received by the Consultant hereunder and under Section 8 of the letter agreement between us of even date herewith (the "Letter Agreement"), and as an additional incentive for the Corporation [Horizon/CMS] to enter into this Agreement, the Consultant hereby agrees that:

(a)  During the term of this Agreement, Consultant shall not, within twenty (20) miles of any health care facility which is controlled and majority-owned by the Corporation or any of its consolidated subsidiaries, engage in any activities in competition with the Corporation if such activities are carried on in the same specific type of health care facility (for example, a nursing home or rehabilitation hospital); provided, however, that Consultant's ownership of less than 5% of the issued and outstanding equity of any publicly held corporation or partnership, or 10% of any privately held corporation or partnership, so engaged shall not in itself be deemed to constitute such engagement by Consultant.

(b)  Consultant shall not use in furtherance of any of his business affairs or disclose to any third party any trade secret, customer list, supplier list, financial data, pricing or marketing policy or plan or any other proprietary or confidential information relating to the business of the Corporation or any of its subsidiaries, provided, however, that the foregoing restrictions shall not apply to information that is (i) generally available to or known in the industry; (ii) disclosed in published literature; or (iii) obtained by Consultant from a third party provided that such third party was not bound by a duty of confidentiality to the Corporation or another party with respect to such information.

(c)  The Consultant understands that the foregoing restrictions may limit his ability to engage in business similar to the Corporation's business anywhere in the United States during the period provided in paragraph (a) above, but acknowledges that he will receive sufficiently high remuneration and other benefits from the Corporation hereunder and pursuant to Section 8 of the Letter Agreement to justify such restrictions and the remedies provided below.  In addition to any remedies provided under applicable law, the Corporation's remedy for a breach of the

provisions of this Section 7 shall include, but not be limited to, the termination of all compensation and all benefits to the Consultant otherwise provided under this agreement and, if such breach was material and has resulted in material damages to the Corporation, and the Consultant shall have failed to cure such breach by ceasing to engage in such prohibited competitive activity within 60 days of receiving written notice of the existence and nature of such breach, the right to require the Consultant to immediately repay to the Corporation all or a portion of the Cash payment as follows:  (i) 100% of the Cash Payment if such breach occurs before July 10, 1996; and (ii) 50% of the Cash Payment if such breach occurs on or after July 10, 1996 but before July 10, 1997.